UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAY LAMKIN,<br><br> Plaintiff,<br><br> v.<br><br>Officers CALEB HUTCHINSON, an individual officer of CDA Police; MICHAEL SAMUEL SHEETS, an individual agent/employee of Defendant(s); CITY OF COEUR D'ALENE, a municipality of Idaho; and COUNTY OF KOOTENAI, IDAHO, a county of Idaho,<br><br> Defendants. | Case No. 2:23-cv-00273-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Civil rights violations by law enforcement officers are a problem in the United States. Sadly, on occasion, those who have sworn to serve and protect our communities instead harass and brutalize. Racial minorities, people with mental illness, and others from marginalized backgrounds disproportionately experience police violence. Sometimes these encounters are fatal. Other times, survivors are left with permanent physical and psychological injuries. Plaintiff Jay Lamkin

mistakenly believes that he is one of these victims. He is not.

In our polarized and litigious society, the real claims of police misconduct and civil rights violations are sometimes drowned out by frivolous and baseless claims. Lamkin's claims have added to the cacophony which interferes with the legal system's ability to hear and address the real-life, but fortunately rare, instances where police conduct becomes police misconduct. Lamkin's claims minimize, belittle, and obscure the real problems of his fellow citizens and makes it more difficult to discern when and where our efforts should be focused to address serious, as opposed to imagined, social problems. For these reasons, and the more specific deficiencies outlined in this decision, it is entirely just and necessary that this action be dismissed in its entirety.

## BACKGROUND

On February 20, 2021, Jay Lamkin arrived at the Riverstone Transit Center in Coeur d'Alene with a video camera. He was tall and heavy-set, and wore a balaclava, sunglasses, and baseball cap that entirely obscured his face.[1] The subsequent incident was fully captured on the transit center surveillance system, policy body cameras, a recording of the 911 call, and Lamkin's own video footage. Because of the fact-sensitive nature of Lamkin's claims, the Court will describe

---

[1] As Lamkin notes, the encounter took place during the COVID-19 pandemic, when face masks were recommended or required. But public health authorities never urged anything like Lamkin's getup, which both concealed his identity and did nothing to stop the spread of airborne diseases.

what happened in detail.

### 1. Encounter with Michael Sheets

Lamkin first spent approximately a minute trying to enter the locked transit center. Ex. D, Dkt. 24-2 (14:40-15:30). He then began filming at the bus stop. Two buses drove away while he filmed on the sidewalk. The bus driven by Michael Sheets arrived, and several passengers embarked. While the bus doors were still open, Lamkin approached and continued filming. He stood just outside the bus but did not enter. Ex. A, Dkt. 24-2 (00:01-01:20).

Sheets got off the bus and walked up to Lamkin. Lamkin, still with his face completely obscured, asked twice, "Do you have an ID?" Sheets returned the question then said, "This is a public bus. Are you wanting to get on this?" Lamkin again made a gesture for Sheets' ID, and Sheets said, "You're causing a problem right now." They repeated this exchange several times, then Sheets entered the bus and contacted the bus dispatcher on the radio. *Id.* (01:25-02:05).

Sheets told the dispatcher, "I got somebody causing a problem. I need somebody out here now please." Lamkin continued filming, standing just outside the open bus doors. Sheets asked, "What are you doing?" Lamkin did not reply. Sheets radioed the dispatcher again and asked her to call the police. *Id.* (02:10-02:50).

Sheets then turned to the bus passengers, who were seated at the back of the

bus. He told them that they were witnesses and asked if anyone knew what was going on. Lamkin stuck his arm inside the bus so that he could film the passengers. One of the passengers responded to Sheets that he had no idea what was happening. Sheets explained, "He's got this thing in our faces and you're included." The passenger began expressing frustration with Lamkin, and Sheets eventually said, "Get off the bus and talk to him if you want." The passenger responded that he was going to stay on the bus. *Id.* (02:45-04:20).

Sheets turned to Lamkin, who had continued silently filming just outside the bus doors, and said: "You want the cops? They're coming." Lamkin asked why he called police. Sheets responded, "Because you are not being cooperative." Lamkin repeated the question, and Sheets said, "Because you are sticking that camera in my face. This is a public bus. You don't want to ride. What do you want?" Lamkin responded, "You don't like America. We have freedom here. This is not Nazi Germany. You are bad man." *Id.* (04:20-04:55).

Sheets exited the bus and walked toward Lamkin, who backed away. Sheets said, "I would get off this property if I was you." Lamkin asked why, and Sheets said that it was a transit station, and Lamkin needed to leave if he was not going to ride the bus. Lamkin began asking who Sheets worked for and insisting again that Sheets identify himself. Sheets returned to the bus and spoke again to the dispatcher. Lamkin repeated, "You are a bad man," and walked around the bus to

the driver's side door. *Id.* (04:55-06:25).

One of the bus passengers exited, approached Lamkin, and told him to leave. Lamkin asked the passenger several times for his name. The passenger threatened to beat Lamkin and repeated that Lamkin needed to leave so that the passenger could go to his dinner. Sheets intervened and ushered the passenger back on the bus while the passenger and Lamkin insulted each other. Lamkin followed them around to the passenger doors and said several times to the passenger, "Is your name Karen?"—a reference to a derogatory term for privileged white women. *Id.* (06:25-7:15).

Sheets spoke again to the bus dispatcher, who relayed his statements to a 911 operator. Sheets said, "Everybody is getting all agitated, and I need this guy removed from the property . . . he's got a big black mask on, he's got glasses on, he's got a dark green jacket . . . he's probably six foot tall . . . as far as I'm concerned, he's a danger to you guys too . . . he was walking around the building and trying to get into the doors too . . . he's causing problems on my bus . . . with one of the passengers. I had to get him back on the bus." The 911 operator asked if they wanted Lamkin trespassed from the property. The dispatcher replied, "I imagine so," and explained that Sheets thought that people were unsafe. At the request of the 911 operator, the dispatcher asked Sheets if Lamkin was told to leave. Sheets replied, "A number of times." Ex. C, Dkt. 24-2 (4:20-7:41).

As Sheets spoke with the dispatcher and 911 operator, Lamkin continued

questioning and harassing him. Eventually Lamkin pointed into the bus and asked,

"You have a camera?" Sheets answered yes. Lamkin then asked—in what one can

only hope was an intentional irony—"Why you take my picture? I no give you

permission to take my picture." Lamkin then resumed insulting Sheets. Sheets

ignored him except to say, "You can leave the property." Ex. A, Dkt. 24-2 (09:15-

11:47); Ex. B, Dkt. 24-2 (00:00-01:45). The police arrived.

### 2. Encounter with Police

Officers Caleb Hutchinson, Jacob Brazle, and Matthew Edwards responded

about ten minutes after the first request for police assistance. The Computer-Aided

Dispatch system had provided them with the following information:

- HAS DISORDERLY MALE ON BUS
- URGENT: ONLY BUS LEFT ON THE LOT
- URGENT: DRIVER NOW SAYING THE MALE IS GETTING INTO HIS FACE & FOR LE TO HURRY UP MALE HAS A CAMERA ACTING WEIRD CUSTOMERS ON BUS GETTING ANGRY
- UNKNOWN MALE BLK MASK DRK GRN JACKET HAS AN ACCENT
- URGENT: NOW CAUSING ISSUES WITH PEOPLE ON THE BUS
- Caller reports someone in danger: ON THE BUS
- URGENT: PER RP11 WANTS HIM TRESPASSED
- URGENT: DRIVER MIKE HAS VERBALLY ASKED THE MALE TO LEAVE MULTIPLE TIMES

*City Defs.' Statement of Facts* ¶ 10, Dkt. 23-2.

Officers Hutchinson and Brazle arrived first. They observed a large man, his

face entirely concealed by a black balaclava and baseball cap, following the bus driver around the front of the bus. Brazle recognized Lamkin from previous encounters, but Hutchinson was unfamiliar with him. As the officers approached, Lamkin moved his camera toward Hutchinson's face. Hutchinson grabbed him and said, "You're being detained." *Id.* ¶¶ 12-14; *Brazle Dec.*, Ex. 2, Dkt. 23-8 (00:00-00:05).

The officers brought Lamkin's hands behind his back to handcuff him. Lamkin pulled forward and complained that they were twisting his wrists. Brazle told him several times to stop pulling. After he was handcuffed, Brazle spoke with Sheets and confirmed that Sheets wanted Lamkin trespassed from the property. Around this time, Officer Edwards arrived. Ex. 2, Dkt. 23-8 (00:05-00:25).

Hutchinson and Edwards walked Lamkin towards one of the police cars. Lamkin yelled several times, "I want my camera," but did not express any pain or discomfort. Near the front of the car, the officers searched him for weapons and explained that he was being detained because he was trespassing at the bus station. They asked him for his ID, and Lamkin responded that he was invoking the Fifth Amendment. He asked again why he was being detained and refused several more times to identify himself. *Hutchinson Dec.*, Ex. 4, Dkt. 23-3 (00:20-02:05).

Hutchinson informed Lamkin that he was under arrest and walked him around to the back of the car. Lamkin complained again that he wanted his camera,

and Hutchinson said he would get it back. At Hutchinson's instruction, Lamkin climbed into the back of the squad car. As he sat down, with one leg still outside of the car, he began groaning in pain and asked for another pair of handcuffs. Hutchinson told him to put his leg in. Lamkin complained that he was "being tortured," and Hutchinson instructed him to sit in a way that would take the pressure off his arms. When Lamkin continued complaining of pain in his shoulder, Hutchinson told him to get out of the car so that they could add another pair of handcuffs. A total of one minute had elapsed from Lamkin's initial request to be double cuffed. *Id.* (02:30-03:55).

Lamkin cried and groaned as the officers spent approximately 30 seconds adjusting the handcuffs. He did not reply when they asked what was wrong with his shoulder. Once double cuffed, the officers told Lamkin again to sit in the back seat of the vehicle. He groaned slightly but did not complain while getting into the car. *Id.* (03:55-04:30).

In the meantime, Brazle interviewed Sheets and the bus passengers. Sheets explained that Lamkin had not fully entered the bus but stood just outside the door, making it potentially dangerous to drive away. Sheets estimated that he had asked Lamkin to leave three times but acknowledged that he did not give a trespass order and lacked the authority to do so. *Pl.'s Statement of Facts* ¶ 4.1-4.7, Dkt. 37-1.

### 3.  The Aftermath

Lamkin was cited for trespassing on a City Link bus. *Id.* ¶ 5.5. At some point after the encounter, he went to the doctor for ongoing shoulder pain and was told to get an MRI. *Id.* ¶ 6.2. Lamkin, who was previously diagnosed with paranoid schizophrenia, has also described significant emotional distress since the incident. *Def. Sheets' Statement of Facts* ¶¶ 64-71, Dkt. 24-1.

In May 2023, Lamkin filed suit in the Idaho State District Court in Kootenai County against Sheets, Hutchinson, the City of Coeur D'Alene, and the County of Kootenai (the latter three collectively, "City Defendants"). The Defendants removed the case to this Court. Lamkin's claims include defamation, intentional infliction of emotional distress, assault and battery, false imprisonment, First Amendment retaliation, excessive force, unlawful arrest, and malicious prosecution. Sheets and the City Defendants each moved for summary judgment on all counts. The Court heard oral arguments on November 5, 2024, and now issues its decision.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims" and thereby prevent these matters "from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327 (1986).

Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Rather, the dispute must concern a material fact—one "that may affect the outcome of the case." *Id.* at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence but may simply point out the absence of evidence to support the non-moving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). The burden then shifts to the non-moving party to produce evidence sufficient to support a favorable jury verdict. *Deveraux*, 263 F.3d at 1076. The non-moving party must show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324. This requires directing the Court's attention "to specific, triable facts"; the Court "is not required to comb through the record to find some reason to deny a motion for summary judgment." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003).

The evidence must be viewed in the light most favorable to the non-moving party, and Court may not make credibility findings. *Anderson*, 477 U.S. at 255. The

Court, however, is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## ANALYSIS

### 1. Claims Against Mr. Sheets

Against Sheets, Lamkin has brought claims for defamation, intentional infliction of emotional distress, assault and battery, and violation of First Amendment rights. To say that these allegations strain credulity would be too generous.

#### A. Defamation

Lamkin argues that Sheets' statements to police during the 911 call were defamatory. Specifically, Lamkin takes issues with the statements that (1) Sheets had told Lamkin to leave multiple times, (2) Lamkin was causing problems with passengers, and (3) Lamkin posed a danger to Sheets and other employees.

A plaintiff asserting defamation must prove that the defendant communicated information about the plaintiff to others, the information was defamatory, and the plaintiff was damaged as a result. *Berian v. Berberian*, 483 P.3d 937, 946 (Idaho 2020). Statements made to law enforcement enjoy a qualified privilege and can only support a defamation claim if made with malice. *Id.* at 948. This means that the plaintiff must additionally prove that the defendant knew that the statements were false or recklessly disregarded the truth. *Clark v. The Spokesman-Rev.*, 163 P.3d

216, 220 (Idaho 2007).

Sheets' statements are protected by the qualified privilege because they were made to law enforcement without malice. Lamkin contends that Sheets knew each of the statements were false, but his version of what happened distorts the encounter—all conveniently captured on his video—beyond recognition.

First, Sheets asked Lamkin to leave when he said, "I would get off the property if I were you" and "If you do not want a ride, leave the property please." Lamkin objects to the grammatical construction of these remarks—one, he says, is a statement rather than a request, and the other is phrased conditionally. *Pl.'s Rep. to Sheets* at 5-6, Dkt. 36. In some legal contexts, such formal contortions would be relevant, but this is not one of them. Sheets was in the midst of a stressful encounter with a large, aggressive man behaving in a strange and bizarre manner. The fact that he failed phrase the request to leave in the ideal grammatical form does nothing to suggest that he knew the statements were false. Nor does it establish that the statements *were* false. Viewed in the light most favorable to Lamkin, the first statement is perhaps ambiguous, but the second clearly communicates a request to leave the property.

Likewise, all the evidence indicates that Sheets believed that Lamkin was causing problems with bus passengers. Indeed, all the evidence indicates that Lamkin was in fact causing such problems. A passenger grew upset about Lamkin

delaying the bus and eventually got off to confront Lamkin. When Sheets

intervened to deescalate the situation, Lamkin began insulting the passenger. This

constitutes "causing problems."

A similar logic applies to the statement about Lamkin posing a danger.

Lamkin argues that Sheets did not act like a man in danger—for instance, he

repeatedly turned his back to Lamkin. This is true, and the analysis here might be

different if Sheets had told 911 that Lamkin represented an immediate threat to life

and limb. But there are many forms of danger. Lamkin was a large, intimidating

man whose identity was concealed.  He was behaving strangely and insulting

people, and his behavior came close to triggering a physical altercation with one of

the passengers. A reasonable bus driver in that situation would conclude that

Lamkin posed some degree of danger, and Lamkin has not proffered any evidence

to suggest that Sheets did not genuinely hold this belief.

The point of the qualified privilege is to ensure that people feel comfortable

calling for emergency services, particularly in ambiguous or confusing situations

like the one instigated by Lamkin. *See Berian*, 483 P.3d at 947. The attempt to

represent Sheets' statements as knowingly false accusations of criminal wrongdoing

is a brazen effort to rewrite what occurred. No matter how favorable the light, this

claim fails as a matter of law.

### B. Intentional Infliction of Emotional Distress

First off, the Court observes that Lamkin apparently fails to appreciate the irony of his bringing an intentional infliction of emotional distress claim based on an encounter that consisted largely of Lamkin himself hurling insults. A claim for intentional infliction of emotional distress requires the plaintiff to establish (1) intentional or reckless conduct by the defendant; (2) the defendants' conduct was extreme and outrageous; (3) the plaintiff suffered severe emotional distress; and (4) a causal connection between the wrongful conduct and the emotional distress. *Edmonson v. Shearer Lumber Products*, 75 P.3d 733, 740 (Idaho 2003). Summary judgment is appropriate if the defendant's alleged conduct "could not reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* at 741.

To qualify as extreme and outrageous, "[t]he conduct must be not merely unjustifiable; it must rise to the level of 'atrocious' and 'beyond all possible bounds of decency.'" *Johnson v. McPhee*, 210 P.3d 563, 572 (Idaho 2009). Examples include:

> an insurance company speciously denying a grieving widower's cancer insurance claim while simultaneously impugning his character and drawing him into a prolonged dispute, *Walston v. Monumental Life Ins. Co.,* 923 P.2d 456, 464–65 (Idaho 1996), prolonged sexual, mental, and physical abuse inflicted upon a woman by her co-habiting boyfriend, *Curtis v. Firth*, 850 P.2d 749, 756–57 (Idaho 1993), recklessly shooting and killing someone else's donkey that was both a pet and a pack animal, *Gill v. Brown,* 695 P.2d 1276, 1277–78 (Idaho Ct. App. 1985), and real estate developers swindling a family out of property that was the subject of their lifelong dream to build a Christian retreat, *Spence v. Howell*, 890 P.2d, 714 724–25 (Idaho 1995).

Sheets' conduct was neither extreme nor outrageous. Lamkin first makes the laughable arguments that Sheets "swatted" him by contacting law enforcement. "Swatting" consists of calling 911 with a story of a fake emergency—for instance, reports of hostages or bombs about to go off—to draw a violent response from a SWAT team. As explained above, Sheets' statements to 911 accurately described Lamkin's behavior and the degree of danger that he potentially posed. To call this swatting is a disservice to the people who have been truly endangered by such false reports.

Lamkin's argument that Sheets behaved outrageously by involving and riling up the bus passengers is also ridiculous. Sheets conduct with the bus passengers—which culminating in him diffusing a confrontation—does not just fall short of "extreme and outrageous." To the contrary, the conduct was justified and reasonable. Lamkin set out to intimidate, insult, and provoke. The fact that he succeeded at doing this does not make him the victim of intentional infliction of emotional distress.

### C. Assault and Battery

In a sea of bad legal arguments, this is one of the worst: the claim that Sheets' statements to the passengers and law enforcement constitute assault and battery against Lamkin. The theory is that Sheets' words caused the bus passenger to threaten to beat Lamkin—assault—and the police officers to handcuff him—

battery.

A civil assault claim requires the plaintiff to establish that "(1) [t]he defendant acted intending to cause a harmful or offensive contact with the person of the plaintiff or a third person, or an immediate fear of such contact; and (2) [a]s a result, the plaintiff feared that such contact was imminent." *Hammer v. Ribi*, 401 P.3d 148, 152 (Idaho 2017). Sheets simply asked the bus passengers if they knew what was going on, informed them that they were witnesses to Lamkin's behavior, and told a frustrated passenger to "get off the bus and talk to him if you want." Ex. A, Dkt. 24-2. There is no evidence from which a jury could infer that Sheets intended to cause a contact or fear of such a contact, so the assault claim fails.

The battery theory—that Sheets lied to law enforcement with the intent of causing them to make harmful or offensive contact with Lamkin—is even more absurd. As explained above, Sheets did not lie to law enforcement. An accurate 911 report that causes police to handcuff the suspect does not constitute battery.

### D. First Amendment Violation

Finally, Lamkin claims that Sheets deprived him of his First Amendment rights. The action is brought under 42 U.S.C. § 1983, which creates a cause of action for violations of federal rights by persons acting under the color of state law. *Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002). Section 1983 does not provide a remedy for actions by private actors. *NCAA v. Tarkanian*, 488 U.S. 179, 191

(1988). Nor does the law allow relief for conduct that occurred under the color of tribal law because Tribes have sovereign immunity. *Evans v. McKay*, 869 F.2d 1341, 1345-46 (9th Cir. 1989).

### i.    State Action

Lamkin's claim fails, first, because Sheets was not a state actor. Sheets was an employee of the Coeur d'Alene Tribe, which is solely responsible for hiring and overseeing drivers. In response, Lamkin asserts that the County and Tribe were entwined in the CityLink bus operation because they jointly operate the transit system, and therefore Sheets' conduct can be fairly ascribed to the County. *See Pl.'s Statement of Facts* ¶¶ 2.1-2.26, Dkt. 36-1.

A seemingly private actor can be liable under Section 1983 if the private actor is sufficiently entwined with the State. This requires "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 195 (2001). In some cases, a joint enterprise—including a transportation enterprise—can create an inference of state action. *See Thompson v. Davidson Transit Org.*, 563 F. Supp. 2d 820, 828 (M.D. Tenn. 2008). Here, however, the Tribe's sovereign immunity complicates the entwinement analysis. Whether the transit system as whole could represent entwinement between the State and the Tribe is irrelevant. Rather, the question is whether Sheet's specific

conduct can be fairly attributed to the State. *See Evans*, 869 F.2d at 1347.

*Evans v. McKay* sets out the appropriate analysis in a situation like this, where the State and a Tribe are involved in a common enterprise. That case concerned the execution of Tribal Court orders to seize cigarettes by City police officers who also served as Bureau of Indian Affairs agents. *Id.* at 1343-44, 1347-48. The owner refused to give the cigarettes up and was eventually arrested pursuant to a City ordinance that prohibited the obstruction of justice. *Id.* at 1344. After the owner sued for wrongful arrest under Section 1983, the Ninth Circuit concluded that the officers plausibly acted in their capacity as police officers, not tribal agents, to enforce a City ordinance rather than tribal law. *Id.* at 1347-49.

The situation here is drastically different. Sheets was not jointly employed, and the Tribe had exclusive and ultimate control over drivers like him. Sheets also was not acting to enforce any state or local law. Given the nature of his job and the claim against him, it does not matter that the County was involved in certain high-level transportation functions like setting system-wide performance goals. Sheets was a tribal employee, and he was acting in that capacity throughout the encounter with Lamkin. Because Sheets did not act under the color of state law, Lamkin's First Amendment claim fails.

### ii.    First Amendment Claim

Lamkin's claim also fails because the record unambiguously demonstrates

that no constitutional infringement occurred. A First Amendment retaliation claim requires the plaintiff to establish that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). Lamkin argues that he engaged in protected activity by recording at the transit center, and Sheets chilled this by calling the police in response.

The First Amendment protects the right to photograph and film "matters of public interest." *Askins v. U.S. Dep't of Homeland Sec.*, 899 U.S. F.3d 1035, 1044 (9th Cir. 2018). To the extent that this was what Lamkin was doing, the conduct is constitutionally protected.

But Lamkin was not merely filming at the bus stop. To start, he was dressed like a bank robber. This is not itself against the law, but his outfit was one of many factors that implied that Lamkin could pose a safety risk to himself or others. Then, when Sheets asked what was going on—a reasonable question since it was unclear whether Lamkin intended to ride the bus—Lamkin began aggressively insisting that Sheets show his ID. Again, this is objectively bizarre behavior—indicative of, at the least, a mental health crisis—that gave rise to genuine safety concerns. For instance, Lamkin stood very close to the bus and one point stuck his arm inside, and Sheets

risked seriously injuring him by driving off. Over the next ten minutes, Lamkin continued harassing and insulting Sheets and the passengers. At no point did he explain that he just wanted to exercise his First Amendment rights and would not interfere if the bus tried to depart.

When Sheets eventually contacted the police, he explained that he needed assistance to leave the transit station. Though he mentioned during the 911 call that Lamkin had his camera out, he never ordered Lamkin to stop filming. In fact, Sheets stated on the call that he did not even know whether Lamkin was really recording anything. It is true that Sheets expressed irritation that Lamkin had the camera in his face. But irritation is not a constitutional offense. Lamkin was free to film, and Sheets was free to be annoyed about it.

At the summary judgment stage, the facts must be viewed in the light most favorable to the non-moving party, but the non-moving party cannot rewrite the facts. Here, the video footage and 911 recording unambiguously demonstrate that Sheets called the police not because of the filming, but in response to other troubling behavior that created legitimate safety concerns. Therefore, Lamkin's protected activity was not a substantial or motivating factor, and Lamkin was not deprived of any constitutional right.

### E. Attorney Fees

Summary judgment must be granted to Sheets on all counts. Sheets has also

requested an award of reasonable attorney fees and costs.

Typically, attorney fees in Section 1983 actions are awarded only to prevailing plaintiffs. *Fox v. Vice*, 563 U.S. 826, 833 (2011); *see* 42 U.S.C. § 1988(b). The point of this one-way fee shifting is to avoid chilling civil rights litigation, where a plaintiff effectively serves "as a private attorney general, vindicating a policy that Congress considered of the highest importance." *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402 (1968). Prevailing defendants, however, can recover attorney fees "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation." *Fox*, 563 U.S. at 833.

Each of Lamkin's claims against Sheets is unreasonable. As detailed above, the tort claims border on the absurd. The First Amendment claim is less of an insult to the legal system but still patently unjustified in fact and law. And though it does not bear on the decision to award attorney fees, the Court also notes that Lamkin's counsel's failure to meet deadlines and respect page limits has needlessly prolonged this litigation and added to the fees incurred by Sheets.

Sheets was simply trying to do his job as a bus driver when Lamkin arrived and began his stream of insults and harassment. Sheets' behavior in response to this pointless and aggressive confrontation was eminently reasonable. It is unfortunate that he has been embroiled in this baseless lawsuit for the last year and a half, and it would be unjust to make him to pay the attorney fees that he incurred as a result of

Lamkin's conduct.

Because Lamkin's claims were unreasonable, the Court will award reasonable attorney fees and costs to Sheets.

### 2. Claims Against City Defendants

The Court now turns to the claims against Officer Hutchinson, the City of Coeur D'Alene, and the County of Kootenai. Against Hutchinson, Lamkin has brought constitutional claims of excessive force, unlawful arrest, and malicious prosecution, as well as a several state law claims premised on the assertion that Hutchinson acted with malice. Lamkin also argues that the City and County are liable for Hutchinson's conduct because they ratified his acts and failed to properly train law enforcement officers. None of the claims are meritorious.

#### A. Excessive Force

Lamkin asserts that Hutchinson used excessive force during the arrest in violation of the Fourth Amendment's protection from unreasonable seizures. Hutchinson argues for summary judgment because he used only the amount of force necessary to secure Lamkin in handcuffs.

Excessive force claims are governed by the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.*

at 396. To determine the degree of Fourth Amendment intrusion, the court examines "the type and amount of force used." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). To assess governmental interests at issue, the court considers factors including the severity of the crime, the threat posed by the suspect, and whether the suspect was actively resisting arrest or attempting to evade. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). In this analysis, the court may take into account whether a lesser degree of force was available, but officers "need not avail themselves of the least intrusive means of responding to an exigent situation." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

The fact-dependent nature of excessive force claims makes summary judgment often inappropriate. Summary judgment is, however, warranted "if, after resolving all factual disputes in favor of the plaintiff, the court concludes that the force used was objectively reasonable under the circumstances." *Cortesluna v. Leon*, 979 F.3d 645, 651-52 (9th Cir. 2020) (internal quotations omitted), *rev'd on other grounds*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021). Here, the undisputed record conclusively shows that police actions were reasonable.

First, the type and amount of force used was minimal. Officer Hutchinson did not use or even draw a weapon. He merely handcuffed Lamkin and employed the degree of force necessary to achieve that goal. The video clearly shows Lamkin pulling away while being cuffed, and when he complained that Hutchinson was

twisting his wrist, Hutchinson urged him to stop pulling so that the process would be as painless as possible. Lamkin did not complain of any further discomfort over the next two minutes as the officers spoke with him and searched his person (though he did repeatedly demand his camera back). Then, when Lamkin expressed pain while getting into the police car, Hutchinson immediately responded by advising him to sit in a way that would alleviate the pressure on his wrists. When this did not help, Hutchinson quickly granted Lamkin's request for a second set of handcuffs. This all took a total of one minute, plus another thirty seconds to actually apply the second set of cuffs. No matter the light in which these facts are viewed, the use of force was minimal.

Second, the government had a significant interest in detaining Lamkin with handcuffs. It is true that trespassing is a low-level, non-violent misdemeanor. But, the totality of Lamkin's behavior justified a belief that he posed a threat. The officers had reports that a large man with his face completely concealed was behaving belligerently and harassing the bus driver and passengers. They arrived to see precisely this conduct as Lamkin tried to engage with Sheets while standing in front of the bus. Lamkin, at the very least, looked like a man in the midst of a mental health crisis and, unfortunately, people in mental health crises can be unpredictable and dangerous. Handcuffing him immediately ensured that he could not do anything to escalate the situation—which would likely necessitate a far more

violent response from the officers. And although Lamkin was more-or-less physically compliant during the arrest, he continuously refused to answer basic requests that he identify himself. This obstructive behavior further justifies Hutchinson's decision to keep him detained in handcuffs throughout the encounter.

These facts must be viewed in the light most favorable to Lamkin, but also from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Through these lenses, it is abundantly clear that Officer Hutchinson did not employ excessive force.[2]

### B. Unlawful Arrest

Lamkin also claims that he was unlawfully arrested in violation of his First and Fourth Amendment rights for recording in public. This turns on whether police had probable cause for the arrest. The undisputed facts establish that they did.

Probable cause exists "if the available facts suggest a 'fair probability' that the suspect has committed a crime." *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006). This is a common-sense standard that considers the totality of the circumstances—"factual and practical considerations of everyday life on which reasonable [persons], not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 168 (1949). When multiple officers are involved, probable

---

[2] Qualified immunity provides a separate basis for summary judgment here and for the other constitutional claims. But because the record conclusively establishes that no constitutional violations occurred, the Court will not spend time on a needless qualified immunity analysis.

cause is assessed based on their "collective knowledge." *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990). The severity of the crime is irrelevant: "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). An officer's subjective beliefs are also irrelevant; the question is whether a reasonable officer in the same situation would possess probable cause for an arrest. *Whren v. United States*, 517 U.S. 806, 811-813 (1996).

Hutchinson was dispatched based on report of criminal trespass. In Idaho, a person commits trespass when he "enters or remains on the real property of another without permission, knowing or with reason to know that his presence is not permitted." Idaho Code § 18-7008(2)(a). In addition to the initial report, Hutchinson confirmed with the dispatcher that Lamkin had been asked to leave, showing that Lamkin had reason to know that his presence was not permitted. *See id.* When Hutchinson arrived on the scene, Lamkin was still there, meaning, obviously, that he had remained on the property. This independent observation together with the dispatcher's report established probable cause to arrest for trespass. And Lamkin's subsequent refusal to cooperate with the investigation separately created probable cause to arrest for obstruction of justice. Indeed, a magistrate judge has already found probable cause for Lamkin's arrest and detention based on both trespass and

resisting an officer.

To argue against probable cause, Lamkin cites *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001), and argues that the officers had a duty to independently investigate before arresting him, rather than simply relying on the report of a victim-witness. A brief discussion of that case is helpful to show just how inapposite it is to the present matter. The plaintiff, Arpin, was a 60-year-old Mexican-American woman trying to ride a public bus. *Id.* at 918. She provided the bus driver with a senior/disabled bus pass along with a picture ID that had expired the previous month. *Id.* The bus driver accused her of cheating and grabbed the ID card. *Id.* After Arpin took the card back and sat down, the bus driver called the police and reported her for battery. When officers arrived, they immediately and violently arrested her. *Id*. The Ninth Circuit determined that Arpin had brought a valid unlawful arrest claim because "[i]n establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses. *Id.* at 425.

In Lamkin's case, in contrast, the officers had independent information substantiating the report of trespass: the fact that Lamkin was still at the location engaging in the same behavior that led to the complaint. Lamkin's attempt to paint himself as the victim here is yet another attempt to rewrite history. In short, because

Hutchinson had probable cause, Lamkin was not wrongfully arrested.

### C. Malicious Prosecution

The existence of probable cause also dooms Lamkin's malicious prosecution claim. To succeed on this claim under § 1983, a plaintiff "must show that the defendants prosecuted him with malice and without probable cause, and that they did so for the purpose of denying him equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). Because Hutchinson had probable cause, summary judgment must be granted, and it is unnecessary to examine the other elements at issue.

### D. Municipal Liability

A municipality can under some circumstances be liable for an agent's constitutional violations. *City of Canton v. Harris*, 489 U.S. 378 (1989). A threshold requirement for municipal liability is that the plaintiff was actually deprived of a constitutional right. As explained above, no constitutional violation occurred. Accordingly, there can be no municipal liability.

### E. State Law Claims

Finally, Lamkin has brought state law claims against Hutchinson for intentional infliction of emotional distress, assault and battery, and false imprisonment. Each of these is barred by the Idaho Tort Claims Act.

The Idaho Tort Claims Act bars intention tort claims against government

employees acting within the course and scope of their employment, unless the employee acted with malice. Idaho Code § 6-904(3). Malice, for purposes of the statute, is defined as "intentional commission of a wrongful or unlawful act, without legal justification or excuse, and with ill will, whether or not injury was intended." *Anderson v. City of Pocatello*, 731 P.2d 171, 188 (Idaho 1986). There is a rebuttable presumption that an act or omission by an employee within the time and place of his employment is without malice. Idaho Code § 6-903(5).

Lamkin asserts that there is "abundant evidence" that Hutchinson acted with malice. *Pl.'s Resp. to Sheets' Mot. for Summ. J.* at 20, Dkt. 37. But saying so does not make it so. Lamkin's only evidence is his unsupported assertion that Hutchinson's conduct was not "commensurate with the circumstances," giving rise to "the implication that the true reason was out of malice." *Id.* As explained above, Hutchinson's actions were well within the scope of the Constitution and fully commensurate with the circumstances. Therefore, Lamkin has not met the burden of rebutting the presumption that Hutchinson acted without malice, and the tort claims are barred under Idaho Code § 6-904(3).

In sum, for the reasons described above, summary judgment must be granted in favor of the City Defendants on all claims.

## ORDER

**IT IS ORDERED that:**

1.    Defendant Sheets' Motion for Summary Judgment (Dkt. 24) is

      **GRANTED**.

2.    Defendant Sheets is additionally entitled to reasonable costs and attorney

      fees incurred in defending this lawsuit. Within thirty days after the

      issuance of this Order, Defendant Sheets shall file his motion for attorney

      fees along with any supporting documentation.

3.    City Defendants' Motion for Summary Judgment (Dkt. 23) is

      **GRANTED**.


DATED: December 23, 2024

B. Lynn Winmill
U.S. District Court Judge